UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

'O'

| Case No. | CR 13-00403(A)-CAS | | Date | February 29, 2016 |
|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | | |
| Interpreter | N/A | | | |

| Catherine Jeang | Laura Elias | Jeff Mitchell
Robert Dugdale |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Aaron Ramos | | X | X | Marisol Orihuela, DFPD | | X | X |

| Proceedings: | DEFENDANT'S MOTION FOR A MISTRIAL (Dkt. 364, filed January 25, 2016) |
|---|---|

## I.   INTRODUCTION AND BACKGROUND

In February 2013, a federal grand jury charged defendants Aaron Ramos and Sharon Paiz with one count of conspiracy to distribute at least fifty grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii) (count one), as well as one count of distribution of at least fifty grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii) (count two).  Id.  Following a five day trial, a jury found defendant Ramos guilty of both counts on September 30, 2014.  Dkt. 120.[1]

Defendant subsequently filed a motion for a new trial, arguing that the Court failed to respond adequately to juror questions, improperly questioned a doubtful juror concerning his verdict, and failed to provide defendant's preferred conspiracy instruction to the jury.  Dkt. 253.  By order dated March 16, 2015, the Court granted defendant's motion for a new trial on the exclusive ground that the juror's statements could be understood as an expression of doubt and may possibly have undermined the unanimity of the verdict.  Id.

On June 30, 2015, the government filed a First Superseding Indictment ("Superseding Indictment") consisting of three counts.  Dkt. 297.  Count One charges defendant with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846, as alleged in the

---

[1] Defendant Paiz entered a guilty plea on March 25, 2014.  Dkt. 76.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

'O'

Original Indictment; Count Two charges defendant with attempt to knowingly and intentionally distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C); and Count Three charges defendant with distribution of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).  Specifically, Count One alleges that the conspiracy to distribute methamphetamine began on an unknown date and continued to on or about February 12, 2010.  According to the Superseding Indictment, (1) Ramos would identify customers, (2) Ramos and Paiz would agree to sell methamphetamine to these customers, and then (3) Paiz would obtain and deliver the methamphetamine to customers, sharing the proceeds with Ramos.  Count Two charged Ramos with attempting to distribute methamphetamine on February 12, 2010, and Count Three charged Ramos with actually distributing methamphetamine on that same date.[2]

Trial in this matter commenced on December 1, 2015.  The government's case-in-chief presented evidence of a series of video and audio recordings documenting the alleged February 12, 2010 methamphetamine transaction.  The recordings were made by a confidential informant who purported to offer money in exchange for methamphetamine.  Tr. Day 1 at 115:20-25.  The informant arrived at defendant Ramos's home in Los Angeles (at 9000 Beach Street), where defendant allegedly proceeded to sell him methamphetamine.  See id. at 118.  Also present during the transaction were Sharon Paiz and a man known as "Laughing Boy," who was Paiz's boyfriend.  Id. at 147:8-12.  During the trial, defendant Ramos argued that Laughing Boy and Paiz were the true architects of the drug deal.  Id. at 118-126.

On December 3, 2015, following a three-day-long trial, the jury convicted defendant Ramos on all three counts.  Dkt 347.  During closing arguments, defendant moved for a mistrial based upon allegedly improper statements made by the government.  Tr. Day 3 at 40:19-21.  The Court acknowledged defendant's motion, reserved judgment, and granted leave for defendant to renew the motion upon conclusion of the trial.  Id. at 46:16-22.  Defendant filed a renewed motion for a mistrial on January 25, 2016.  Dkt. 364. ("Motion").  The government filed an opposition on February 8, 2016.[3]  Dkt. 368 ("Opp'n").  Defendant filed a reply on

---

[2] With the exception of the addition of a charge for attempted distribution of methamphetamine on February 12, 2010, the Superseding Indictment is nearly identical to the Original Indictment.  Compare Dkt. 1, with Dkt. 297.

[3] In its opposition to defendant's motion, the government cites to United States v. Alvarez-Moreno, 657 F.3d 896 (9th Cir. 2011) in arguing that this Court "lacks authority to grant a mistrial after a verdict has been returned."  Opp'n at 1.  Defendant first moved for a mistrial during the trial itself, and the Court reserved judgment, stating that defendant could renew the motion following the verdict.  However, pursuant to Alvarez-Moreno, "[i]nstead of coming within the authority to grant a mistrial, . . . [a] district court's authority to order a new

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

'O'

February 22, 2016.  Dkt. 369 ("Reply").

On February 29, 2016, the Court held oral argument on defendant's motion.  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  A motion for a new trial is "directed to the discretion of the district judge" and "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict."  United States v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981).

## III.   DISCUSSION

In the instant motion, defendant sets forth three justifications for a new trial.  First, defendant argues that the prosecutor misstated the evidence on three occasions during closing arguments.  Second, defendant contends that the prosecutor improperly shifted the burden of proof during closing arguments.  Third, defendant argues that the prosecutor improperly commented on defendant's failure to present evidence.  For the reasons stated below, the Court concludes that defendant has failed to meet his burden of demonstrating that any purported error materially affected the verdict.  Accordingly, the motion must be denied.

### A.    The Government's Purported Misstatements of the Evidence

#### 1.    Testimony of Alicia Ramos

Defendant first argues that the prosecutor misrepresented to the jury the uncontroverted testimony from defense witness Alicia Ramos, defendant's mother, who had testified at a hearing prior to defendant's first trial.  Tr. Day 2 at 85:2-10.  Although the defense wished to call Ms. Ramos for the second trial, she had relocated to Mexico and could not be reached.  See id.  In her previous testimony, Ms. Ramos had described her property located at 9000 Beach Street in Los Angeles, where the alleged drug deal took place, as well as who lived there.

---

trial after a verdict has been entered is governed by [Federal Rule of Criminal Procedure 33]." 657 F.3d at 900-01.  Accordingly, the Court construes defendant's motion for a mistrial as a Rule 33 motion for a new trial.  See Reply at 1 (clarifying that defendant seeks a new trial through the instant motion).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

'O'

Specifically, when Ms. Ramos was asked to describe the property, she responded: "There are two houses; one in the front, one in the back, and a garage in the middle." Id. at 143:21-23. Later in the questioning, the following exchange occurred:

> Q: You mentioned there was a back house. Who lived in the back house?
>
> A. I rented the house in the back and I do not remember the name of the person I was renting it to.
>
> Q. You mentioned there was a garage. Was there anyone living in the garage?
>
> A. Yes.
>
> Q. Do you remember the name of that person?
>
> A. The name I don't remember. They called him the [L]aughing [B]oy.

Defendant now argues that Ms. Ramos's testimony is key to its defense theory: because the drug deal took place in the *garage* at 9000 Beach Street, the fact that Laughing Boy lived in the garage supports an inference that Laughing Boy—and not defendant—conducted the deal. Reply at 3-4. The government's theory of the case, however, holds that Laughing Boy did not actually live at 9000 Beach Street at all.[4]

In its closing argument, the government referred back to Ms. Ramos's testimony as follows: "Now, this is the conflicting part. Alicia Ramos says that Laughing Boy rented the *backhouse*. That's the only evidence you have of it before you." Tr. Day 3 at 30:24-25 (emphasis added). The defense objected on the grounds that the government misstated the testimony, and the government responded, "Your Honor, I can read Alicia Ramos's testimony." Id. at 31:4-5. The Court agreed, and the government then recited the testimony as follows:

---

[4] In support of this contention, the government cited, *inter alia*, a statement made by Laughing Boy in an audio recording in which he says that he "live[s]" or "stay[s]" with someone named Loca, who does not live on the Ramos property. Tr. Day 3 at 89:8-14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

'O'

> Q: Can you describe that property?
>
> A: Yes, there were two houses; one in the front, one in the back, and the garage in the middle.
>
> Q: You mentioned there was a backhouse. Who lived in the backhouse?
>
> A: I rented the house in the back, and I do not remember the name of the person I was renting it to.
>
> Q: Do you remember the name of that person?
>
> A: I don't remember the name. They called him Laughing Boy.

Id. at 31:9-18.  In reciting the testimony as such, the government omitted the question and answer regarding the garage, thereby making it seem as though Ms. Ramos testified that Laughing Boy had rented the *backhouse*, when in reality she stated that someone else lived in the back house, while Laughing Boy lived in the *garage* (where the drug deal took place).  The government also used a slide presentation to supplement its closing statement.  One of the slides, titled "Where did Laughing Boy Live?", features a bullet point which reads, "Alicia Ramos: L.B. rented back house."  Motion, Ex. B at 18.

After the government's closing argument, the defense moved for a mistrial based on, *inter alia*, the government's misrepresentation of Ms. Ramos's testimony.  Tr. Day 3 at 40:19-21.  The Court agreed that Ms. Ramos's actual testimony "was not consistent with what was read to the jury [in closing argument]" and that the government was "completely off base reading what [it] did."  Id. at 43:17-18, 22-23.  The Court noted, however, that it was "not saying [the prosecutor] had a bad intention," but rather that the prosecutor "had to read the transcript accurately," which "indicated that Laughing Boy, for a short time, lived in the garage."  Id. at 44:8-11, 46:2-3.  The prosecutor stated that he had omitted lines that "were just unnecessary" and "still believe[d] [he had] read it accurately."  Id. at 46:4-9.  The Court denied defendant's request that the Court read Ms. Ramos's testimony again for the jury.  Id. at 48:2-5.

In its own closing statement, defendant addressed the misrepresentation by (1) informing the jury that the prosecution misrepresented Ms. Ramos's testimony, (2) describing the testimony more accurately, and (3) calling upon the government to correct it.  Id. at 54:12-20.  The government opened its rebuttal as follows: "Before I start, I would like to reread Ms. Ramos's transcript.  I skipped ahead in a few sections because I was running short on time, and

now I'm going to read more of the transcript for you." Tr. Day 3 78:24-79:3. The government then read approximately two pages of Ms. Ramos's testimony, including previously omitted questions and responses. Id. at 79:4-81:11.

Defendant now argues that the government's misrepresentations provide sufficient grounds for a mistrial because they struck at the heart of the defense's key theory in the case—namely, that the deal took place in what defendant argued was Laughing Boy's *home* (i.e., the garage), that the real conspiracy was between Laughing Boy and his girlfriend, Sharon Paiz (who pled guilty in this case), and that defendant was "merely present" during the charged crimes and lacked the requisite intent to commit them. According to defendant, the initial misrepresentation was made all the more egregious by the government's subsequent inaccurate recital of the testimony, and further worsened on rebuttal by the government's failure to tell the jury "in a straight-forward manner that what he had previously claimed was, in fact, wrong." Motion at 5.

The government contends that any misstatement or misrepresentation was an honest mistake based upon its substantive misunderstanding of Ms. Ramos's testimony. Specifically, the government contends that it "mistakenly believed that Ms. Ramos was referring to the same structure and to the same tenant" when referring to the "back house" and the "garage," such that reading the "garage" question was immaterial. Opp'n at 7. The government further contends that because it did not understand or recognize its own misstep at the time, it chose to read the entire relevant portion to the jury "in an abundance of caution." Id. at 8.

In the Ninth Circuit, " '[t]he trial judge has broad discretion in controlling closing argument,' and 'improprieties in counsel's arguments to the jury do not constitute reversible error unless [1] they are so gross as probably to prejudice the defendant, and [2] the prejudice has not been neutralized by the trial judge.' " United States v. Navarro, 608 F.3d 529, 535-36 (9th Cir. 2010) (quoting United States v. Guess, 745 F.2d 1286, 1288 (9th Cir. 1984)). For example, in United States v. Del Toro–Barboza, the prosecutor made multiple false statements of fact in closing argument, but the district court nonetheless determined such conduct was only "an honest mistake and not prosecutorial misconduct," and further that the mistakes were "harmless" on balance and did not warrant a new trial. 673 F.3d 1136, 1153 (9th Cir. 2012). The district court was satisfied that the defendant received a fair trial in part because the Court had admonished the jury that the "lawyers' statements were not evidence and that if the jury remembered facts differently, their memory should control." Id. In the instant case, the Court provided a similar admonishment before closing argument, instructing the jury as follows: "Remember, closing argument is not evidence. If what the attorneys argue is different from what you remember the evidence to be, your memory of the evidence is what controls." Tr. Day 3 at 7:5-8; see also United States v. Bracy, 67 F.3d 1421, 1431 (9th Cir. 1995) (district

court's instruction to jury that "[q]uestions, objections, statements, and arguments of counsel are not evidence" can neutralize the prejudicial effect of a prosecutor's improper comments in closing).

More importantly, the prosecutor's error was adequately mitigated after it occurred. In his own closing argument, defendant stated that "[t]here is undisputed testimony from Ms. Alicia Ramos that she rented the garage to Laughing Boy," and that "certain questions weren't read when that transcript was read back to you, and I do trust that [the prosecutor] will correct that because he has a duty as a federal prosecutor to correct any misrepresentation." Tr. Day 3 at 54:17-20. On rebuttal, although the prosecutor did not expressly acknowledge a misstatement, he nonetheless re-read the relevant testimony in full, providing the jury ample opportunity to hear the correct version of Ms. Ramos's testimony regarding who lived in the garage. Thus, the jury had sufficient access to an accurate record of Ms. Ramos's testimony—first, by hearing it read aloud during the government's case-in-chief; and second, by hearing the prosecutor re-read the misstated portions of the transcript during rebuttal.

As the government itself concedes, it made an error when it mischaracterized Ms. Ramos's statements and then proceeded to omit portions of her testimony when reading back the transcript. On balance, however, the Court finds that—irrespective of the government's intentions—the misstatements were not "so gross as probably to prejudice the defendant," particularly in light of the curative efforts of both defendant and government.[5] Navarro, 608 F.3d at 535-36.

---

[5] Defendant challenges the government's assertion that its misstatements were simply an honest mistake. Specifically, defendant contends that "[t]he prosecutor's claim of an innocent mistake is . . . countered by the fact that this trial was a re-trial consisting of largely same evidence, and the prosecutor had been the lead prosecutor on both of the trials. As such, he knew, or should have known, the evidence that had been presented, particularly where the trial lasted less than two days and had only a handful of witnesses." Reply at 3. Again, the Court finds— irrespective of the government's intent or the degree of its recklessness, and in light of the ample evidence supporting the jury's verdict—that the gravity of the government's error does not rise to a level warranting a mistrial. See Smith v. Phillips, 455 U.S. 209, 219 (1982) ("The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# CRIMINAL MINUTES - GENERAL

'O'

### 2. Testimony of Defense Translator Cecilia Gutierrez

Cecilia Gutierrez, a Spanish interpreter and translator for the Federal Public Defender's Office, testified for the defense. See Tr. Day 2 at 104. Ms. Gutierrez testified that, unlike the government's interpreter and translator, she could not positively identify certain speakers on the government's recording of the drug transaction. See, e.g. id. at 116:11-14. During cross-examination, the government pointed to a particular line of dialogue on the recording's transcript and asked, "And you weren't able to identify who that speaker was; correct?" Id. at 128:3-4. Ms. Gutierrez responded, "That's right." Id. at 128:5. The government subsequently asked, "Did you identify any other male voices?", and Ms. Gutierrez replied, "I didn't identify any other male voices. That's why I indicated UMV [Unidentified Male Voice]." Id. at 128:17-19.

In closing argument, the government referred back to Ms. Gutierrez's testimony as follows: "[Ms. Gutierrez] didn't hear Laughing Boy, didn't hear Youngster. The only people that . . . their expert could hear was the defendant, the informant and Sharon Paiz." Tr. Day 3 at 26:14-19. The government then represented that Ms. Gutierrez "testified that *nobody else was in the room*." Id. at 26:23 (emphasis added). The defense objected, citing misrepresentation of the testimony, id. at 26:25, and the Court immediately admonished the jury that its memory as to Ms. Gutierrez's testimony should control, id. at 27:2-3.

Defendant now argues that the government misrepresented the evidence because Ms. Gutierrez did not say "nobody else was in the room," but only that she could not identify every voice on the recording. Defendant further argues that, "[l]ike the prosecutor's arguments regarding Laughing Boy's home, this misrepresentation goes to a critical part of the allegations against [defendant] and the theory of defense." Motion at 5-6. The government contends that it meant only that one could reasonably *infer* from Guitierrez's testimony that nobody else, besides the three persons whose voices she could identify, was in the room. See United States v. Atcheson, 94 F.3d 1237, 1244 (9th Cir. 1996) ("It is not misconduct for the prosecutor to argue reasonable inferences based on the record.").

While the government did misstate Guitierrez's testimony, any error made by the prosecution on this collateral issue is minimally prejudicial to the defendant and is unlikely to have affected the verdict, particularly in light of the Court's corrective instruction to the jury.

### 3. Testimony of Special Agent Lopez

Special Agent Gustavo Lopez, who testified for the government, was the lead investigator in this case at the time of the crime. See Tr. Day 1 at 169. Special Agent Lopez's testimony

'O'

provided a foundation for the government's audio and video recordings of the drug transaction. See, e.g. id. at 174. On cross-examination, defendant asked Special Agent Lopez about the recording equipment used during the investigation. Lopez testified that his investigation had used the video and audio recorders in prior operations, and that on two past occasions the video recordings had failed while the audio portion continued. Id. at 50:19-21.

During closing argument, the government stated that in "the other investigations, [the video] didn't play at all, it didn't record at all." Tr. Day 3 at 84:21-22. Defendant contends that this statement introduced facts not elicited in Special Agent Lopez's testimony. Motion at 6. The Court disagrees, as it is not clear that the government's characterization of the testimony is inaccurate. When asked if the video "did not work" in prior investigations, Special Agent Lopez responded, "Correct." Tr. Day 2 at 50:19-21. A "working" video must both record and play back properly. Accordingly, the government's paraphrasing of Special Agent Lopez's testimony is not an improper introduction of new evidence, but rather a permissible inference.

The government in closing further stated that "[The video] was an old device. It was in black and white. It was over five years old, and you . . . heard that it malfunctioned in two other investigations as well." Tr. Day 3 at 84:11-14. Defendant argues that these statements were not based upon any evidence. In its opposition, the government does not cite any testimony or evidence supporting its assertions about the recording device, but instead contends that it made a reasonable inference based upon Special Agent Lopez's testimony that the video had been used previously. Regardless of whether this is an improper inference, the Court at the time stated its agreement with defendant's objection and again admonished the jury that "if counsel argues something that [the jury doesn't] recall as part of the evidence, you [the jury] may disregard the argument." Id. at 85:2-6. The Court is satisfied that its curative instruction was sufficient to prevent any prejudice to defendant.

**B.     Comments Regarding the Burden of Proof and Reasonable Doubt**

**1.     Burden of Proof**

During its closing argument, the government's slide presentation featured a section titled "Questions," which contained a list of questions attacking the defense's theory of the case. Motion, Ex. B at 68. As it presented its closing, the government then posed a series of hypothetical questions to the jury concerning defendant's theory. Tr. Day 3 at 39:3-18. The prosecution prefaced these questions by stating, "So as I leave you, I want to leave a couple questions in your mind, and these are questions I want the defense to — *they're going to need to answer these questions*." Id. at 39:1-2 (emphasis added). Defendant objected and moved for a mistrial. Id. at 40:19-21.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL

'O'

Defendant argues that the government's suggestion that defendant would "need to answer these questions" improperly shifted the burden of proof by implying that defendant was required to answer the government's questions to establish his innocence. Motion at 8. The Court disagrees. While "[t]he prosecution must prove all the elements of a criminal offense beyond a reasonable doubt," Estelle v. McGuire, 502 U.S. 62, 69 (1991), the prosecutor also

> ["]may comment on the defendant's failure to present exculpatory evidence, provided that the comments do not call attention to the defendant's own failure to testify." United States v. Mares, 940 F.2d 455, 461 (9th Cir. 1991) (citation omitted). Furthermore, comments intended to highlight the weaknesses of a defendant's case do not shift the burden of proof to the defendant where the prosecutor does not argue that a failure to explain them adequately requires a guilty verdict and reiterates that the burden of proof is on the government. Id. "It is a common practice for one side to challenge the other to explain to the jury uncomfortable facts and inferences." Id.

United States v. Vaandering, 50 F.3d 696, 701 (9th Cir. 1995).

Here, the prosecutor's closing argument began with an analysis of "the charges and the elements that the *government has to prove*." Tr. Day 3 at 7:21-21 (emphasis added). The statement that defendant "needed" to answer certain questions came after a lengthy discussion of defendant's theory of the case, in which the prosecutor endeavored to point out purported inconsistencies therein. Thus, "[w]hile the prosecutor's phrasing was inartful, his meaning is evident from context." United States v. Tucker, 641 F.3d 1110, 1122 (9th Cir. 2011). The Court therefore cannot find, as defendant contends, that the prosecutor's remark "undoubtedly placed a burden on [defendant] that he did not have and that the constitution requires not be placed on him." Motion at 8; Compare United States v. Wilkes, 662 F.3d 524, 541 (9th Cir. 2011) (upholding a conviction where the prosecutor argued in closing that in order to find the defendant not guilty, the jury "had to believe his testimony"), with United States v. Perlaza, 439 F.3d 1149 (9th Cir. 2006) (overturning a conviction where the prosecutor told the jury that the presumption of innocence will "vanish" during deliberation, and the trial judge "ratified" the prosecutor's remark by failing to provide a proper instruction on the burden of proof). Furthermore, to the extent that the government's suggestion was improper, any such impropriety was adequately mitigated, as the Court had previously instructed the jury on many occasions that the government had the burden to prove defendant guilty beyond a reasonable doubt. See, e.g., Tr. Day 1 at 17:1-2; 54:16-18; Tr. Day 2 at 159:17-18, 164:3-7, 164:10-13, 166:12-14, 167:5-7, 168:1-3, 168:19-21, 169:2-4, 169:9-10, 172:22-24.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

'O'

**2.      Description of "Reasonable Doubt"**

During its rebuttal argument, the government described the reasonable doubt standard for the jury.  Tr. Day 3 at 81:12-17.  The government illustrated the concept with the following analogy:

> Now, the best way to describe what reasonable doubt is, I think, is through an example, and I think that people, jurors, everybody makes reasonable doubt decisions every single days [*sic*] of your life.  When you're driving down the street and you want to change lanes, you don't know for a certainty that the person in front of you is going to slam on his brakes or is not going to slam on his brakes, or that when you're making a turn, you don't know that someone's not going to cut you off at the very last minute.  There's no way to tell.  Nobody can have 100 percent certainty.
>
> But what do you do?  You examine the evidence.  You look in your rear-view mirror.  You look in your side-view mirrors, and hopefully a few of you actually look over your shoulders as well to double check.  And then you move forward.  You make your decision and you move forward, and that's what we're asking you to do here today.

Id. at 81:23-82:14.  At this point, the Court interrupted the prosecution, noted that both sides had given "their versions of reasonable doubt," and then requested that the jury "pay attention to [the Court's] written instructions which tell you what reasonable doubt is."  Id. at 82:18-19.  Defendant also made its objection known at this point in time.  Id.

Defendant argues that the government's reasonable doubt analogy was improper because it trivialized the reasonable doubt standard, in violation of defendant's due process rights, and also amounted to a substantively incorrect statement of the actual standard.  The government contends that it was merely responding to defendant's purportedly inaccurate description of reasonable doubt by invoking "an example of decision-making in an important life and death situation."  Opp'n at 17.  The government notes, however, that it now "recognizes that many courts look with disfavor upon analogies of the reasonable doubt standard."  Id. (collecting cases).

In his reply, defendant cites to a decision of the California Court of Appeal, in which the prosecutor characterized reasonable doubt as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

‘O’

> The standard is reasonable doubt. That is the standard in every single criminal case. And the jails and prisons are full, ladies and gentlemen. It's a very reachable standard that you use every day in your lives when you make important decisions, *decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving. If you have reasonable doubt that you're going to get in a car accident, you don't change lanes*. So it's a standard that you apply in your life. It's a very high standard. And read that instruction, too. I won't paraphrase it because it's a very difficult instruction, but it's not an unattainable standard. It's the standard in every single criminal case.

People v. Nguyen, 40 Cal. App. 4th 28, 35 (1995). The California Court of Appeal found it improper to suggest that people apply a reasonable doubt standard "every day" or that the standard "is the same standard people customarily use in deciding whether to change lanes." Id. at 36. The court further stated—and this Court agrees—that "[i]t is clear the almost reflexive decision to change lanes while driving is quite different from the reasonable doubt standard in a criminal case."[6] Id.

Nguyen has been cited approvingly by numerous federal courts in the Ninth Circuit—and rightfully so.[7] See, e.g., Hinojosa v. Gipson, No. 2:13-CV-1188-JAM-KJN, 2014 WL 1271695, at *17 (E.D. Cal. Mar. 27, 2014) ("Had the prosecution elaborated on this statement by connecting it to decisions one makes every day, as the prosecutor incorrectly did in Nguyen [by analogizing the reasonable doubt standard to changing lanes while driving] . . . the comment might have been improper."); Horton v. McWean, No. CV 10-6428- JFW JEM, 2012 WL 6110488, at *23 (C.D. Cal. Nov. 5, 2012), report and recommendation adopted, No. CV 10-6428-JFW JEM, 2012 WL 6131200 (C.D. Cal. Dec. 10, 2012) ("[The prosecutor's] comparison of the reasonable doubt standard to everyday decisions made while crossing a street

---

[6] The court in Nguyen ultimately held that the defendant had waived his claim by not raising it in the lower court; however, this holding was later overturned. See People v. Johnson, 115 Cal. App. 4th 1169, 1172 (2004).

[7] The Court notes that although analogizing the reasonable doubt standard to important decisions one may confront in daily life carries the danger of trivializing the relevant standard, such a practice is not *per se* improper. See United States v. Juarez-Meza, 545 F. App'x 607, 609 (9th Cir. 2013) ("Nor did the prosecutor misstate the burden when she said that 'a firm conviction that is not absolute' was sufficient to find guilt beyond a reasonable doubt, *drawing analogies to making important decisions in daily life*.") (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL

'O'

or stopping at a red light arguably trivialized the standard."); Suy v. Pliler, No. CIVS022765 RRB EFB P, 2007 WL 4200451, at *5 (E.D. Cal. Nov. 21, 2007), report and recommendation adopted, No. 202-CV-02765-JKS-EFB, 2008 WL 496432 (E.D. Cal. Feb. 21, 2008) ("[T]he prosecutor's reference to everyday decisions, such as what grade to give a school assignment or whether a motorist is guilty of a traffic violation if he exceeds the speed limit, come close to improperly trivializing the reasonable doubt standard.").

While the Court agrees that the prosecution's analogy arguably trivialized the relevant standard, the Court cannot conclude that it is reasonably likely that the jury applied the analogy and thereby lessened the government's burden of proof. Upon hearing the prosecutor's assertion that "[y]ou make your decision and you move forward, and that's what we're asking you to do here today," Tr. Day 3 at 82:12-14, the Court interrupted the closing argument and noted that while the prosecution and the defense had each offered their own "versions" of the standard, the jury should "pay attention to [the Court's] written instructions which tell you what reasonable doubt is," id. at 82:18-19. Nonetheless, defendant argues that "[b]ecause the Court here never instructed the jury that the Government's analogy was mistaken or inaccurate, its curative instruction could not adequately remedy the government's error." Reply at 9. The Court disagrees—"[t]he jury is regularly presumed to accept the law as stated by the court, not as stated by counsel."[8] United States v. Rodrigues, 159 F.3d 439, 451 (9th Cir. 1998); United

---

[8] In its motion, defendant also relies upon the decision of a federal district court in granting a *habeas* petition in Stoltie v. California, 501 F.Supp.2d 1252 (C.D. Cal. 2007) (Pregerson, J.), aff'd sub nom. Stoltie v. Tilton, 538 F.3d 1296 (9th Cir. 2008). In that case, the state court jury encountered difficulty both in reaching a verdict and in understanding the concept of reasonable doubt, and repeatedly submitted questions seeking clarification from the state court judge. See id. at 1252-55. The trial judge ultimately provided an analogy:

> If I were to tell you that I am going to Blythe [a city in California's Mojave Desert] . . . in the middle of July and I am taking my skis with me because it snows every July 4, you might say, I doubt it. And that would be a reasonable doubt, wouldn't it? But if I told you I am going to Blythe and I am taking my swimming suit and water skiis to go skiing in the Colorado River in the middle of July, but I am afraid it might be too cold, you'd think, I doubt it, but maybe that's not so unreasonable. Reason and logic apply.

Id. at 1255. A federal district court later granted defendant's *habeas* petition and thereby overturned the resulting conviction, finding the trial judge's confusing analogy to create a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# CRIMINAL MINUTES - GENERAL
'O'

States v. Mende, 43 F.3d 1298, 1302 (9th Cir. 1995) ("[W]e must presume that juries will follow the district court's limiting instructions.").

Accordingly, the Court finds that any danger of jury confusion posed by the prosecutor's problematic analogy was adequately mitigated by the Court's immediate interjection and admonishment that the jury follow the Court's written instructions. See Arizona v. Johnson, 351 F.3d 988, 995 (9th Cir. 2003) ("The influence of the trial judge on the jury is necessarily and properly of great weight, and jurors are ever watchful of the words that fall from [the judge]. Particularly in a criminal trial, the judge's last word is apt to be the decisive word.") (citation omitted).

### C. Comments Regarding Defense Strategy

Defendant argues that the government made improper statements regarding the defense's conduct during the trial. Motion at 11. During closing, the prosecution displayed government's Exhibit 101 for the jury, which is a transcript of the audio recordings. See Tr. Day 3 at 22:17-21. The government stated that "they [i.e., the defense] *somehow left this part out, but it's really important*." Id. (emphasis added). The prosecutor then read portions of the transcript in which Laughing Boy states that he "live[d]" or "stay[ed]" with someone named Loca, whom he knew "very well" and who was the roommate of his girlfriend, Sharon Paiz. Id. at 22:18-21. Later in the closing argument, the prosecutor referred to the same transcript and stated as follows:

> So we have a little bit of conflicting testimony and evidence here. So the question is where did Laughing Boy live? Now, Laughing Boy told you that he lives with Loca. That was the Government's Exhibit 101 that I just showed you. That was actually their transcript. ***They didn't want to show you that***. They didn't present —

---

reasonable likelihood that the jury would apply an unconstitutional standard of proof. Id. at 1264. Central to the federal court's conclusion were the facts that (1) the jury had been deadlocked before hearing the confusing analogy, (2) the jury expressed its confusion over reasonable doubt, and (3) although proper jury instructions had been giving during the trial, the skiing analogy was the last thing that the jury heard before reaching a verdict—there was no "curative instruction." Id. None of these facts exist in the present case, where the jury had not yet begun deliberation when it heard the analogy, immediately heard the Court temper the government's analogy with an admonishment to follow the Court's written jury instructions on reasonable doubt, and did not express any confusion over the instructions during deliberations.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL

'O'

Id. at 29:19-23 (emphasis added). At that point, defendant objected, stating, "This goes against the jury instruction that the Government requested about speculating." Id. at 29:24-30:1. The Court stated, "I think that's right." Id. at 30:2-3.

Defendant now argues that these statements—*i.e.*, the prosecutor's suggestion that defendant "didn't want to show [the jury]" Laughing Boy's statements about "liv[ing]" with Loca, and "somehow left this part out, but it's really important"—amount to an impermissible accusation that the defense "was keeping evidence from the jury," made all the more problematic because "there was no curative instruction" and "the prosecutor [failed to] clarify that he improperly argued that the defense did not want the jury to see a piece of evidence." Motion at 11. The government contends that it was simply pointing out weaknesses and purported inconsistencies in defendant's case—in the government's view, evidence that Laughing "liv[ed]" or "stay[ed]" with Loca undermined defendant's contention that Laughing Boy lived in the garage. See Opp'n at 19-20. However, defendant contests the notion that the inferences to be drawn from Laughing Boy's comments undermine defendant's theory in the case at all: "To the defense, evidence that Laughing Boy 'stayed' or 'lived' with Loca, who without dispute was [Paiz's] roommate, is consistent with the defense's theory that Laughing Boy and [Paiz] were in a romantic relationship and likely to deal drugs together." Reply at 9-10.

Ultimately, regardless of what reasonable inferences are likely to be drawn from the evidence, the Court finds, as the government contends, that the prosecution is free to disagree with defendant's statement of the case and point to perceived weaknesses therein—especially where, as here, defendant does not perceive of such evidence as weakening his case at all. See United States v. Franco–Delgado, 224 Fed. App'x 722 (9th Cir. 2007) (upholding a conviction where the prosecution argued that the defense was attempting to "hide" or "trick" with its arguments); see also Ratsavongsy v. Caden, 135 Fed. App'x 10, 11 (9th Cir. 2005) (prosecutorial remarks found harmless when "aimed more at defense counsel's self-defense theory than at defense counsel himself").

In his reply, defendant advances a different argument (for the first time). Specifically, defendant contends that "the government itself requested an instruction for the jury not to speculate on the portions of the audio that had not been presented to the jury," and thereafter acted in bad faith when "it did exactly that by arguing that the defense did not want the jury to see certain evidence." Reply at 10. The Court disagrees that the government impermissibly invited any such speculation about portions of the audio that had *not* been presented to the jury. Rather, the government was attempting to argue that it *had* submitted evidence that, in its view, undermined defendant's theory of the case; accordingly, the prosecutor's statement that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

'O'

defendant "somehow left this part out" was merely an attempt to highlight defendant's perceived failure to reconcile allegedly inculpatory evidence. Regardless, the Court cannot conclude that these statements were likely to affect the verdict, or that they otherwise provide grounds for a new trial.

IV.   CONCLUSION

In accordance with the foregoing, defendant's Rule 33 motion is hereby **DENIED**.[9]

IT IS SO ORDERED.

|  | 00 | : | 15 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |

---

[9] While the Court has discussed each of defendant's arguments for a new trial separately, the Court also rejects defendant's invitation to grant the motion based upon cumulative error. Motion at 11; see United States v. Frederick, 78 F.3d 1370 (9th Cir. 1996).